KEITH H. RUTMAN, CSB #144175
Attorney at Law
501 West Broadway, Ste. 1650
San Diego, California 92101-3541
Telephone: (619) 237-9072
Facsimile: (760) 454-4372
email: krutman@krutmanlaw.com

Attorney for Defendant
CLEOTHA YOUNG

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA
(Hon. Dana M. Sabraw)

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff, <br> v. <br> CLEOTHA YOUNG, <br> Defendant. | Case No. 14-CR-1288-DMS <br> DEFENDANT'S SUR-REPLY IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE <br> DATE/TIME: TBD <br> COURTROOM: 13A |

COMES NOW Defendant, CLEOTHA YOUNG, by and through his attorney of record, and hereby files his sur-reply brief as directed by the Court.

*Introduction*

At the age of 37, Cleotha Young, an African American man who had suffered tragedy at a young age and who had struggled to regain his balance afterwards, found himself indicted in federal court as the most minute part of a large drug conspiracy. His cousin, the lead defendant, Randy Graves, asked Mr. Young if he would help offload some marijuana from a boat due to land in Lompoc, Ca. and drive it back to San Diego. He agreed. They went to Lompoc, but the boat never arrived, so they left and returned to San Diego. That ended Mr. Young's involvement in the conspiracy. Mr. Graves and others, but not Mr. Young, went back a few days later and retrieved the marijuana. Mr. Young had no other involvement in the conspiracy.

The government offered a plea agreement whereby the parties would jointly

recommend a sentence within the applicable guidelines range, which was well above the 10-year statutory mandatory minimum sentence. However, if Mr. Young elected to go to trial, the Government announced its intent early on to seek an enhancement pursuant to 21 U.S.C. § 851. Mr. Young, having and asserting he had no knowledge of the amount of marijuana to be offloaded, chose to exercise his right to trial. The government, in return, made true on its promise and filed a Notice of Information doubling the mandatory minimum sentence to twenty years' imprisonment[1]. Of all charged 17 defendants[2], only the ringleader, Mr. Graves, and Mr. Hollins, Mr. Cook, Mr. Foreman and Mr. Ross proceeded to trial. (Mr. Graves by himself, and the latter four, accused of violent acts in furtherance of racketeering, in a joint trial)

Of <u>all</u> charged defendants, only Mr. Graves, Mr. Hollins, Mr. Cook, Mr. Foreman and Mr. Ross received higher sentences that Mr. Young[3]. One defendant, Mr. Bandy (who pled), and Mr. Young each received the second longest terms of incarceration, 240 months each. Mr. Young's sentence was driven by his record, not his actions. His sentence differed by orders of magnitude despite the fact that he was the least involved. He suffered the "trial penalty" in its truest form.

Mr. Young is now seeking a sentence reduction via the Compassionate Release provisions of the First Step Act. He has successfully completed vocational programming while in the custody of the Bureau of Prisons, which will allow him to

---

[1] Mr. Young's trial, and thus the Notice of Information filed pursuant to 21 U.S.C. § 851, was prior to the passage of the First Step Act. Thus, with one prior drug felony conviction, the mandatory minimum sentence doubled from ten years to twenty years.

[2] 17 in this case and another 12 in related case no. 14-cr-1286-DMS.

[3] Everyone in the related case got a much lower sentence than Mr. Young.

2

find meaningful employment upon his release. He has a solid reentry plan in place, with secure housing and financial support in place. He is a survivor of COVID-19, albeit suffering from restricted breathing[4]. Finally, his sentence was overly long.

*Applicable Case Law*

18 U.S.C. § 3582(c)(1)(A) provides, in relevant part:

> The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or

---

[4] His medical records are enclosed as Exhibit E. He suffers from a number of middle-aged ailments. However, he reported that as of January 30, 2021, the regular quarantine is full and now inmates that need quarantine are being sent to the SHU. Last year when it got really bad at Lompoc, people did not inform medical they were having symptoms because they didn't want to go to the SHU and be unable to communicate with their family. Of course, because they didn't let medical know about their symptoms, the COVID virus spread throughout the facility. Mr. Young reports that staff is not checking temperatures or doing any other type of covid screening here on a regular, consistent basis. He reports that FCI Lompoc doesn't have a rigorous testing regime in place. The population has not been greatly reduced so social distancing is impossible. The temporary medical unit has been discontinued. The only treatment he has received for shortness of breath is an asthma inhaler. He hasnt received a thorough follow up even though he has complained about it to medical staff. One of his major underling health conditions is his lungs have already been damaged from COVID, and there is no telling what a second bout with COVID will do to him. Of course, it is still medically unclear if someone who had COVID-19 can get it again (or get a variant), or whether a variant would render the vaccine ineffective.

upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(I) extraordinary and compelling reasons warrant such a reduction; . . .

In U.S. v. Brooker, 976 F.3d 228 (2d Cir 2020), the Court held that:

"the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion).  In Brooker, the court also noted that "that "[r]ehabilitation ... alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t)" but that "Congress seemingly contemplated that courts might consider such circumstances when it passed the original compassionate release statute in 1984. See S. Rep. No. 98-225, at 55-56 (1984) (noting that reduction may be appropriate when "other extraordinary and compelling circumstances justify a reduction of an unusually long sentence") see also U.S. v. Maumau, 2020 U.S. Dist. LEXIS 28392, 2020 WL 806121, at *6-*7 (D. Utah Feb. 18, 2020)(discussing this history and collecting cases where district courts have reduced sentences in part because they were overly long).

Id. at *20-23.

The First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, "amends numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." United States v. Brown, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019) (citing Cong. Research Serv., R45558, The First Step Act of 2018: An Overview 1 (2019)). One of the changes resulting from the Act is that it "allows defendants, for the first time, to petition district courts directly for compassionate release." Id. As one district court recently explained:

The effect of the amendments is that a district judge has the ability to grant a prisoner's motion for compassionate release even in the face of BOP opposition or its failure to respond to a prisoner's request for compassionate release in a timely manner. . . . Congress's express purpose in implementing these changes was to expand the use of compassionate release sentence reductions under § 3582(c)(1)(A). See, e.g., First Step Act, PL 115-391, 132 Stat 5194, 5239 (titling the subsection amending §

3582, "Increasing the Transparency and Use of Compassionate Release"); 164 Cong. Rec. S7314- 02, 2018 WL 6350790 (Dec. 5, 2018) (statement by Senator Cardin, cosponsor of the First Step Act, noting that its purpose was to "expand[s] compassionate release" and "expedite[] compassionate release applications").

United States v. Young, No. 2:00-CR-00002-1, 2020 WL 1047815, at *5 (M.D. Tenn. Mar. 4, 2020); see also United States v. Maumau, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *4 (D. Utah Feb. 18, 2020) ("[O]ne of the express purposes of the First Step Act was to increase the use and transparency of compassionate release.").

Section 3582(c)(1)(A) imposes an exhaustion requirement requiring a defendant to fully exhaust all administrative rights to appeal before a defendant may move the court for release.

"Even where exhaustion is seemingly mandated by statute . . . the requirement is not absolute." Washington v. Barr, 925 F.3d 109, 118 (2d Cir. 2019). There are generally three bases for waiver of an exhaustion requirement. See United States v. Perez, ___ F.Supp.3d ___, No. 17-CR-513-3 (AT), 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020)(discussing exceptions to statutory exhaustion in context of motion for compassionate release during COVID-19 pandemic). "First, exhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." Washington, 925 F.3d at 118. "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile." Id. at 120. Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief," including situations where "the relief the agency might provide could, because of undue delay, become inadequate." Id. at 119-20. Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." Id. at 119; See United States v. Haney, ___ F.Supp.3d ___, No. 19-CR-541 (JSR), 2020 WL 1821988, at *4 (S.D.N.Y. Apr. 13, 2020)(courts have discretion to waive the exhaustion requirement where doing so would serve Congressional objectives in light of circumstances now faced by prisoners as a result of the COVID-19 pandemic); United

5

States v. Decator, No. CR CCB-95-0202, 2020 WL 1676219, at *2 (D. Md. Apr. 6, 2020) (finding motion properly before the court where warden denied petitioner's request).

Mr. YOUNG has satisfied the exhaustion requirements applicable to this motion. See Exhibit A. These documents have been previously provided to the Government, and it is beleived that the Government does not dispute that he did so.

*Summary of Instant Offense*

On May 6, 2014, a one-count indictment was filed in the Southern District of California, charging 17 defendants with violating 18 U.S.C. § 1962(d), Conspiracy to Conduct Enterprise Affairs Through a Pattern of Racketeering Activity. U.S. v. Graves et. al., 14-cr-1288-DMS.

On February 24, 2015, a nine-count superseding indictment was filed variously charging 17 defendants in Count 1 with 18 U.S.C. § 1962(d), Conspiracy to Conduct Enterprise Affairs Through a Pattern of Racketeering Activity; Count 2 with 18 U.S.C. § 924(c)(1)(A), Brandish, Carry and Use a Firearm in Relation to a Crime of Violence; Count 3 with 18 U.S.C. 1959(a)(3), Violent Crime in Aid of Racketeering; Count 4 with 21 U.S.C. § 841(a)(1), 841(b)(1)(A)(viii), and 846, Conspiracy to Distribute Methamphetamine; Count 5 with 21 U.S.C. § 841(a)(1), and 841(b)(1)(A)(vii), and 846, Conspiracy to Distribute 1,000 Kilograms and More of Marijuana; Count 6 with 21 U.S.C. § 841(a)(1), 841(b)(1)(A)(ii), and 846, Conspiracy to Distribute Cocaine; Count 7, 21 U.S.C. § 841(a)(1), 841(b)(1)(A)(iii), and 846, Conspiracy to Distribute Cocaine Base; Count 8 with 18 U.S.C. § 1591(a), (b) and (c), Sex Trafficking of a Minor; and in Count 9 with 18 U.S.C. § 1591(a) and (b), Sex Trafficking by Force, Fraud or Coercion. Mr. YOUNG was charged only in Counts 1 and 5.

Mr. Young was arrested on April 25, 2015 and remained in custody throughout the entirety of his case.

On May 12, 2015, a nine-count second superseding indictment was filed in the Southern District of California, charging Mr. YOUNG, and six individuals (GRAVES,

HOLLINS, COOK, BANDY, FOREMAN and ROSS) with various charges. YOUNG was charged in Count 1 with 18 U.S.C. § 1962(d), Conspiracy to Conduct Enterprise Affairs Through a Pattern of Racketeering Activity. Additionally, Mr. YOUNG was charged in Count 5 with 21 U.S.C. § 841(a)(1), and 841(b)(1)(A)(vii), and 846, Conspiracy to Distribute 1,000 Kilograms and More of Marijuana. (See Indictment)

On June 4, 2015, Mr. YOUNG was convicted by jury verdict of Count 5 of the second superseding indictment, as noted above. The jury verdict included includes a specific finding that 1,000 kilograms or more of marijuana fell within the scope of the defendant's agreement with his co-conspirators.

He was thereafter sentenced to 240 months. In counsel's view, the only reason Mr. Young remains in custody today is because he suffered what the National Association of Criminal Defense Lawyers (NACDL) calls "the trial penalty" and contends significantly undermines the defendant's constitutional right to a trial, and thus, the integrity of our criminal justice system itself. As NACDL elucidates, defendants often face an impossible Hobson's choice: plead guilty or risk facing exponentially longer sentences if they go to trial. National Association of Criminal Defense Lawyers, The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It (2018) (NACDL Report), available at https://www.nacdl.org/getattachment/95b7f0f5-90df-4f9f-9115-520b3f58036a/the-trial-penalty-the-sixth-amendment-right-to-trial-on-the-verge-of-extinction-and-how-to-save-it.pdf; see also Exhibit B: Letter from Members of U.S. Congress to Acting Pardon Attorney, dated March 9, 2020 (urging clemency for those subject to a trial penalty, noting that the trial penalty results in significantly longer prison sentences and impacts the criminal justice system through coerced plea bargaining).

The drug quantity range charged in the indictment was sufficient to trigger a ten-year mandatory minimum. Mr. Young has served time in state prison. He had one prior state court felony conviction for low-level drug distribution, see Presentence

Investigation Report, pp 54-64. These 2 facts resulted in sufficient criminal history points to make him ineligible for the safety valve[5]. Without the safety valve, cooperation would be the only option available for Mr. Young to receive less than ten years' imprisonment if convicted. These two convictions scored at 6 points, placing him in Level III, but his two priors combined to qualify him as a career offender, elevating him to Level VI.

Shortly after Mr. Young made his initial appearance, the government approached Mr. Young's counsel (me) with a non-minimum mandatory plea offer (Exhibit C), calling for an agreement to jointly recommend a sentence within the agreed upon guidelines range:

| | |
|---|---:|
| 1. Base Offense Level - [USSG § 2D1.1] | 32 |
| 2. Minor Role [USSG § 2D1.1(a)(5)] | 30 |
| 3. Adjustment for Role in the Offense [USSG § 3B1.2(b)] | -2 |
| 4. Acceptance of Responsibility [USSG § 3E1.1] | -3 |

The parties agreed that, if Defendant is determined to be a career offender pursuant to USSG § 4B1.1(a), the applicable base offense level shall be determined pursuant to USSG § 4B1.1(b).

These calculations resulted in an adjusted offense level of 32 @ Criminal History Category VI, resulting in a guidelines range of 210-262 months.

Even according to the government, Mr. Young played a minor role in the conspiracy. If Mr. Young plead guilty, the government required him to agree to a sentence of no less than 210 months, almost double the mandatory minimum; if he didn't plea and went to trial, however, the government would file an information pursuant to 21 U.S.C. § 851 and double the mandatory minimum sentence to which

---

[5] As Mr. Young's conviction occurred in 2015, it pre-dated the First Step Act. While he still would be ineligible for the safety valve, his minimum mandatory sentence would be 15, not 20, years.

Mr. Young would be exposed upon conviction, adding another 30 months to the sentence they offered to recommend.

His only other option was to plead guilty without the benefit of a plea agreement, meaning (1) he would still be a career offender and (2) the judge might not give him a role adjustment without the Government's agreement to do so.

As Judge John Gleeson (ret.) explains in the NACDL Report, the trial penalty embodies and drives several troubling factors that undermine the entire criminal justice system. Primarily, it has led to the "vanishing trial." NACDL Report at 3. Trials are the ultimate check and balance on prosecutorial power. When a prosecutor knows that charges will have to be proved beyond a reasonable doubt to a unanimous jury, based only on admissible evidence, with all exculpatory evidence disclosed to the defense, they are disincentivized from bringing ill-advised charges in the first place. Id. Conversely, "[a] system characterized by extravagant trial penalties produces guilty pleas in cases where the government cannot satisfy that burden." Id.

In effect, the trial penalty encourages prosecutors to enlarge the difference between the sentencing outcome if the defendant pleads guilty and the sentencing outcome if the defendant goes to trial and loses, in order to maximum the leverage to secure guilty pleas. Id. Indeed, the trial penalty creates such strong pressure that it leads innocent people to plead guilty to crimes they did not commit. Id. at 3, 6. For these reasons, the trial penalty erodes the defendant's Sixth Amendment right to a trial. No one should be required to gamble years of liberty, or in Mr. Young's case, the rest of their life, to get their day in court. Id. at 8.

Ultimately, the trial penalty deprives defendants of years and, as here, decades of their liberty, and unnecessarily raises the costs of incarceration. As a result of the trial penalty, the court had no choice but to sentence Mr. Young to twenty years' imprisonment. See Exhibit D: Transcript of Sentencing Hearing at page 20. This the only reason Mr. Young has no hope of being released until September 27, 2031.

*Length of Sentence Served To Date*

As a result of the government filing an § 851 enhancement, the court had no discretion in sentencing Mr. Young - it was bound by law to impose a mandatory minimum sentence of 240 months (20 years). As of the date of this motion's submission, Mr. Young has served almost 6 years in custody.

*Applicable Changes in the Law Since Sentencing*

If Mr. Young were sentenced today, his sentence would be different given numerous changes in the law that have occurred since 2015 - the year Mr. Young was sentenced. If sentenced today, Mr. Young would not have been exposed to a 20-year mandatory minimum. The passage of the First Step Act reduced the mandatory minimum sentence for someone with a single drug prior from 20 to 15 years. See 21 U.S.C. 841(b)(1)(A).

*Demonstration of Good Conduct While Incarcerated*

Mr. Young has been in custody for over six years. During these years, Mr. Young has demonstrated exemplary behavior and has used his time to further his education and skills and to give back to his community of fellow prisoners.

As evidenced by his progress reports, Mr. Young has had an impressive record of achievement while in the bureau of prisons, earning numerous educational certificates and successfully maintaining long periods of institutional employment. among other accomplishments, Mr. Young has:

1. Successfully completed the twelve-hour drug program as well as anger management, parenting, victim impact, 7-habits, and 6-hour class training as a coach/umpire.
2. Successfully completed a heating and air conditioning trade class and attained a national certification in the HVAC trade.
3. Successfully completed 1st section basic business computer literacy (typing, introduction to Microsoft word, excel, and power point)
4. Enrolled in and completed several Ace classes- Investing 1, Nutritional and

exercise needs, beginning kiln operator, and beginning guitar.  (See Exhibit F)

With his focus on vocational courses, Mr. Young continues to work towards mastering skills that will assist him with employment upon his release. Currently Mr. Young works as an Orderly in his housing unit which has been instrumental in ensuring proper sanitation of the housing unit during the COVID crisis. Mr. Young also works tournament management, and in a basketball officiating clinic, which is a job often reserved for highly trusted inmates given the nature of the work.

Over his six years of incarceration Mr. Young has only had two disciplinary infractions which occurred at the beginning of his sentence and stemmed from his lack of familiarity with facility practices. He has not incurred an infraction since December 2015.

*Demonstration of rehabilitation*

As discussed above, Mr. Young has spent the past six years focusing on his rehabilitation. He has participated in anger management counseling, cognitive behavioral therapy, and most importantly substance abuse counseling. He has also been an active participant in his facility's tournament management program that helps inmates participate in group sport activities in a positive way.  All of his rehabilitative work is evidenced in the fact that for the past five years he has been infraction-free.

*Reentry plan*

If granted relief, Mr. Young has an incredible support system in place to help him successfully transition back into the community. All of the educational work that Mr. Young has done throughout the years of his incarceration will serve him well in supporting himself and his family and will assist him being a productive and contributing member of society.

In addition to an employment opportunity upon release, Mr. Young also has a residence secured. He would be welcome to live with his brother Christopher Young in North Dakota. Mr. Young has an incredible network of financial and emotional support just waiting to assist him upon his release.

*Not Likely to Pose Danger to Public Safety If Granted Clemency*

It is pretty obvious from his history that should Mr. Young be released, he will not pose a danger to public safety.

*Criminal history*

As discussed above, Mr. Young has two prior convictions. The Court commented extensively at sentencing about his record (Exhibit D).  However, given his age, it is generally recognized that the chances of recidivism are reduced.  See https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview

*No history of violence*

As evidenced by his PSR, Mr. Young has only one instance of violence, and in that event, he acted as an accomplice/get-away driver.  Nor did the instant offense allege any instances of violence committed by Mr. Young.

His sex offense was committed at a young age and he was eventually rehabilitated by the Juvenile Court system.  He has never been arrested or accused of another sex crime again, although he suffered several theft related juvenile adjudications and clearly was a low level dealer.

*Supervision for 5 years*

Upon release, pursuant to the statute of conviction, Mr. Young will be on supervised release for five years. That should serve to provide Mr. Young with necessary assistance to transition successfully back into the community; and should serve to ease anxieties as he will be under the jurisdiction of the court.

*Conclusion*

A motion for compassionate release asks the Court to consider the existence of "extraordinary and compelling" reasons that a defendant might raise. It is simply not just for Mr. Young to remain incarcerated for ten more years simply because he chose to exercise his constitutional right to a jury trial. Many, if not most, of the other individuals indicted in his case have long since been released - including individuals

who self-admittedly were more significantly involved than he was.

    Nothing further is served by keeping Mr. YOUNG incarcerated. Mr. YOUNG respectfully requests the Court reduce Mr. YOUNG's sentence to 84 months.

Respectfully Submitted,

Dated: February 19, 2021

s/Keith H. Rutman
KEITH H. RUTMAN
Attorney for Defendant
Email: krutman@krutmanlaw.com